IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

FLYWHEEL ENERGY PRODUCTION
LLC;  VAN BUREN ENERGY
PRODUCTION LLC;  RAZORBACK
PRODUCTION LLC;  and CAER
ENERGY LLC                                                                    PLAINTIFFS

v.                                          No. 4:25-cv-616-DPM

ALAN YORK, in his official capacity as
the Director of the Arkansas Oil and Gas
Commission;  PULOMA PROPERTIES
LLC;  and RICHARD PULOMA                                  DEFENDANTS

## ORDER

The question presented is whether to put Arkansas Act 1024 of 2025 on hold while this constitutional challenge to it proceeds. The General Assembly explained the Act's purpose in its title: "An Act to amend the law regarding oil and gas production and conservation; to clarify the allocation of production and cost following integration order by defining 'net proceeds';  to address obligations of operators and working interest owners to mineral owners;  and for other purposes."* The Act will go into effect on August 5th. It is directed at natural gas production in the Fayetteville Shale. The main operators (the entities who operate the wells) and working interest owners

_____

* All capitals eliminated and emphasis removed.

(the entities who hold the right by lease to develop and sell the natural gas) contend that the Act violates the Contract Clause, the Takings Clause, and the Due Process Clause of the U.S. Constitution, and some similar clauses of the Arkansas Constitution.   Unless it specifies otherwise, the Court will refer to this overlapping group of operators and working interest owners as Flywheel, the lead plaintiff.  Flywheel presses these constitutional claims against the Director of the Arkansas Oil and Gas Commission in his official capacity and some mineral owners, which the Court will call Puloma.  Whether Mr. Puloma and his company should stay in the case is another interesting threshold question, which the Court defers to focus on the deep issue, a "who must pay some expenses" question.

In integrated drilling units, may Flywheel deduct a share of certain post-production expenses (such as for gathering, treating, and compressing the natural gas) from the statutory royalty — the first one-eighth of well proceeds?  In an appeal after a state administrative proceeding, the Arkansas Court of Appeals answered "no." *Flywheel Energy Production, LLC v. Arkansas Oil & Gas Commission*, 2023 Ark. App. 483, at 22, 678 S.W.3d 851, 863.  The Arkansas Supreme Court denied a petition to review that decision.  In a series of cases, this Court (speaking through Brother Rudofsky) answered "yes." *E.g.*, *Doc. 73* in *Hurd v. Flywheel Energy Production, LLC*, Case No.

4:21-cv-1207-LPR (E.D. Ark. 24 October 2024).** This Court answered only after the Arkansas Supreme Court had declined to accept a certified question about the current version of the controlling statute. Several of these *Hurd*-progeny cases are on appeal.

After two similar but failed legislative efforts in recent years, the General Assembly then passed the now-challenged Act 1024. The Act answered the deep question with "it depends"—follow the underlying mineral leases. Act of 22 April 2025, No. 1024, § 1, 2025 Ark. Acts (amending Ark. Code Ann. § 15-72-305). But this answer is mostly a "no" for two reasons. First, the AOGC's form lease (which covers rights where there is no lease), doesn't allow these deductions. *York Exhibit 1 at 27.* Second, the testimony at the preliminary injunction hearing established that many of the executed leases in the Fayetteville Shale limit or forbid deductions of post-production costs from royalties.

*

Some background and some nuance. The current version of the governing statute, Arkansas Code Annotated § 15-72-305, dates from 1985. Development of the natural gas in the Arkoma Basin was then in full swing. Integration of drilling units in each section of land had been

---

** *See also Flowers v. Flywheel Energy Production, LLC*, Case No. 4:21-cv-330-LPR; *Eubanks v. Flywheel Energy Production, LLC*, Case No. 4:21-cv-329-LPR; *Oliger v. Flywheel Energy Production, LLC*, Case No. 4:20-cv-1146-LPR; *Pennington v. BHP Billiton Petroleum (Fayetteville), LLC*, Case No. 4:20-cv-178-LPR.

–3–

part of Arkansas law since the 1930s. The unit's operator could develop the whole with royalties paid to all owners of mineral interests, whether an owner had leased his rights or not. But, what if one or more working interest owners (entities that had leased mineral rights) decided for some reason not to sell its share of the gas produced in a given month? No sale, no income—either to the working interest owner or, downstream, to the owner of the mineral rights. This system did not sit well at the coffee shop. Say there were four mineral owners (often neighboring landowners) in a section. All see the wells pumping. Two owners could be smiling about their healthy royalty checks, while the other two would have empty pockets.

The General Assembly's answer was the one-eighth statutory royalty. By operation of law, every operator had to distribute the first one-eighth of the "net proceeds" received from the monthly sale of gas to all the mineral owners in the integrated unit. Ark. Code Ann. § 15-72-305(a)(3). Everyone shared in the first fruits. The statute, though, didn't define net proceeds. For the leased minerals, the operator distributed these proceeds for the working interest owner. The statute did define what each working interest owner was obligated to pay each operator: "one-eighth (1/8) of the revenue realized or royalty moneys from gas sales computed at the mouth of the well, less all lawful deductions, including, but not limited to, all federal and state taxes levied upon the production or proceeds . . .." Ark. Code

Ann. § 15-72-305(a)(3)(B)(i).  According to expert testimony received at the hearing from Michael Callan, who has worked in the Arkansas oil and gas industry for four decades, circa 1985 all or almost all leases were net leases.  The operators and working interest owners could and did deduct expenses.  Little if any daylight existed between the statutory royalty obligation on the first one-eighth and the contractual obligation on any royalty due under a lease.  In general, the 1985 fix seemed to satisfy.

Fast forward fifteen or so years to the early 2000s.  The Fayetteville Shale play began.  And there was a hotly competitive scramble to lease up mineral rights.  Unlike in the Arkoma Basin, many of the resulting leases were gross leases, which specified that working interest owners (the lessees) could not deduct some or all expenses from the royalties. In the early and middle years of the Fayetteville Shale play, most of the biggest players (such as Flywheel's predecessor in interest, Southwestern) did not deduct post-production expenses from the one-eighth statutory royalty.  Another big player, XTO, did.  (XTO was Van Buren Energy Production's predecessor in interest).  As the play matured, the working interests have been sold and resold. Southwestern Energy, Chesapeake, and XTO are no longer involved. When Flywheel came onto the scene in 2018, things changed. Various post-production expenses have been deducted from the first one-eighth royalty payments.  Lawsuits, and Act 1024, resulted.

Given the expedited proceedings, the Court denies Flywheel's mid-hearing motion, *Doc. 53*, to exclude video excerpts from the legislative history. *McGriff Insurance Services, Inc. v. Madigan*, 2022 WL 16709050, at *2 (W.D. Ark. 4 November 2022).

*

Now back to the pressing issue. Is Flywheel entitled to a preliminary injunction of the new Act while it litigates its constitutional challenges to that Act?

*First*, the parties agree on the legal standard. The familiar *Dataphase* factors, as modified by later precedent, apply. *Dataphase Systems, Inc. v. C.L. Systems, Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc); *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20–22 (2008); *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724, 731–32 (8th Cir. 2008) (en banc). The most important consideration is whether Flywheel is likely to succeed on the merits. To stop the implementation of a law duly enacted by the people's representatives, Flywheel must show that it *is* likely to prevail on one or more of its constitutional claims. *Rounds*, 530 F.3d at 731–32. This greater burden honors the law's presumption that the statute is constitutional.

*Second*, the parties likewise agree that the unamended version of Ark. Code. Ann. § 15-72-305, and other applicable statutes, are embedded in their mineral leases and other contracts. "This Court

has said that the laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as if they were expressly referred to or incorporated in its terms." *Home Building & Loan Association v. Blaisdell*, 290 U.S. 398, 429–30 (1934) (Hughes, C.J.) (quotation omitted); *see also Woodend v. Southland Racing Corp.*, 337 Ark. 380, 384, 989 S.W.2d 505, 507 (1999).

*Third*, the current version of Ark. Code. Ann. § 15-72-305 contains a latent ambiguity. The "net proceeds" an operator must pay are undefined. The category is clear but its contents are not. The related provision about what a working interest owner must pay an operator clarifies some things but not every thing: "all lawful deductions" may be made, "including, but not limited to," state and federal taxes. Ark. Code. Ann. § 15-72-305(a)(3)(B)(i). The statute's approved list of deductions specifies taxes. The list includes other things, too — lawful deductions. But what else is on the General Assembly's approved list? The statute does not tell us. Embedded in the parties' leases, therefore, was an ambiguous statutory term about what expenses could be deducted. On the ambiguity point I agree with the Arkansas Court of Appeals' decision and disagree with this Court's earlier decisions. If there was any doubt that Ark. Code. Ann. § 15-72-305's meaning was murky, the fact that diligent and careful judges have come to reasonable and opposite conclusions about that meaning removes it.

*Fourth*, what do these ambiguous phrases in the unamended statute—"net proceeds" and "all lawful deductions"—mean? The Court must make an *Erie*-educated prediction about what the Arkansas Supreme Court would hold. *Blankenship v. USA Truck, Inc.*, 601 F.3d 852, 856 (8th Cir. 2010). And this Court must answer, albeit on a partial record and in a bit of a hurry, because Flywheel's constitutional challenges depend on what the governing Arkansas law is before Act 1024 goes into effect.

Start with the statute's words. Net proceeds are not gross proceeds. And lawful deductions are not limited to taxes. The structure of the whole, as Brother Rudofsky concluded, likewise favors Flywheel's interpretation that post-production expenses can be deducted. *Doc. 45 at 9–20* in *Hurd*, Case No. 4:21-cv-1207-LPR (E.D. Ark. 26 May 2023).

The views of the agency charged with administering this complex statutory scheme are entitled to consideration and respect, though not blind deference. *Myers v. Yamato Kogyo Co., Ltd.*, 2020 Ark. 136, at 5–6, 597 S.W.3d 613, 617; *compare Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 392 (2024). The AOGC concluded that post-production costs were not properly deducted from the statutory royalty. *Flywheel*, 2023 Ark. App. at 7, 678 S.W.3d at 856.

Consider, too, the course of performance across the Fayetteville Shale, which can liquidate an ambiguous statutory/contractual term.

*E.g., RAD-Razorback Limited Partnership v. B.G. Coney Co.*, 289 Ark. 550, 555, 713 S.W.2d 462, 466 (1986). Deducting transportation expenses, even though those expenses are not mentioned, seems to have always been fine. The preliminary record available indicates that, in most instances, other post-production expenses were not deducted from the one-eighth royalty during the Shale's first decade or so. *Flywheel*, 2023 Ark. App. at 3, 678 S.W.3d at 854. That changed when Flywheel succeeded Southwestern on the scene. Van Buren's predecessor, however, deducted those expenses. And this Court ruled for that predecessor, Exxon/XTO, rejecting mineral owners' challenge to those deductions. *Doc. 109* in *Whisenhunt Investments, LLC v. Exxon Mobil Corp.*, Case No. 4:13-cv-656-JM (E.D. Ark. 28 July 2016). That case started and ended before Flywheel bought into the Shale play. I also recall a settled case about deductions for these post-production expenses early in the play. It involved all the big companies. *Collins v. Seeco, Inc.*, Case No. 4:11-cv-761-DPM (E.D. Ark. 19 October 2011). There must be more to this story. At this point, though, all the Court can say is that the course of performance is mixed, but leans against Flywheel.

The Arkansas precedent in the neighborhood does not answer the question directly. It can be read either as the Arkansas Court of Appeals described or as this Court has described in *Hurd* and like cases.

I come back to the statute's words and the General Assembly's purposes in the 1985 amendments. The point was to resolve "certain inequities" in how royalties were distributed. Act of 6 March 1985, No. 272, 1985 Ark. Acts 441, 441–42 (Whereas Clause). Net is after expenses. Some deductions beyond taxes are lawful. Cotton must be ginned, ore refined, and gas treated. The raw material must be put in salable form. The hearing testimony indicated that the quality of extracted natural gas varies. Over time, the quality also declines, requiring additional treatment. Some geologic truth seems to have brought the statute's latent ambiguity forward. As a witness testified, the Fayetteville Shale is in shallow decline, on the far right of the productivity bell curve. Section 15-72-305 aims to provide a uniform initial royalty to all mineral owners in an integrated unit. The General Assembly could have easily specified that individual leases, or the AOGC's form lease, controlled the expenses deductible from the statutory royalty. It did not. Instead, everyone shares in the net first fruits, whether they agreed to lease their mineral rights or not, and, if they did lease those rights, no matter the specific lease terms. The statute provides a rough justice solution to promote development of a valuable commodity subject to shared ownership. This Court's preliminary *Erie* prediction is that the Arkansas Supreme Court would construe the current version of Ark. Code. Ann. § 15-72-305 to allow for

deduction of post-production expenses in calculating the one-eighth statutory royalty for all mineral owners in integrated units.

*Sixth*, Act 1024 of 2025 speaks clearly, removing the ambiguity in Arkansas law. Deductions for post-production expenses are determined by the lease, either the AOGC's form (if the mineral owner has not executed a lease) or the mineral owner/working interest owner's lease. Act of 22 April 2025, No. 1024, § 2. The clarity is commendable. There is no dispute that the General Assembly could provide that needed clarity for future leases affecting mineral rights. *Hurd v. Arkansas Oil & Gas Commission*, 2020 Ark. 210, at 9–11, 601 S.W.3d 100, 105–06. But this amendment to Ark. Code Ann. § 15-72-305 changes the deal prescribed by this admittedly murky statute embedded in Flywheel's legal relationships.

The Contract Clause's words bar states from passing any law that impairs the obligations of contracts. U.S. CONST. art. I, § 10, cl. 1. This absolute bar has been lowered. *Ashley Sveen v. Kaye Melin*, 584 U.S. 811, 818–19 (2018); *Association of Equipment Manufacturers v. Burgum*, 932 F.3d 727, 731–33 (8th Cir. 2019). The States' police powers are now understood to provide more maneuvering room for public-protecting legislation that affects existing contractual relationships. The first question is whether a law substantially impairs existing contractual relationships. *Sveen*, 584 U.S. at 819; *Burgum*, 932 F.3d at 730–31. The second is whether the state has shown "a significant and legitimate

public purpose underlying the Act." *Burgum*, 932 F.3d at 730 (quotation omitted); *see also Sveen*, 584 U.S. at 819.

Flywheel is likely to prevail on its Contract Clause claim. Act 1024 substantially impairs Flywheel's contractual rights. It changes the bargain, making post-production expenses non-deductible even though those expenses reduce the overall net proceeds from the wells. These expenses are not insignificant. A witness testified that they're approximately $2.67 million dollars each month for all Flywheel, Razorback, and Van Buren wells. These expenses are approximately $530,000 for the wells with gross leases. Could these lessees and CAER have seen this change in the law coming when they took over the leases? *Burgum*, 932 F.3d at 730. That's a close question because of the statute's ambiguity, the varying practices of predecessor operators in the Shale, and the litigation on this issue. At best, it's a maybe. Could Flywheel have done anything to safeguard its rights or can it do anything to reinstate them? No. Unlike in *Blaisdell*, this is not a moratorium with a clear end date. And Flywheel can't get any interim relief like the court-set monthly rental payments during that moratorium. 290 U.S. at 416–17. Plus, unlike in *Sveen*, no possibility exists for reinstating payment of post-production expenses by simply filling out a form or having a court make a preemptive finding. 584 U.S. at 819–22. Act 1024 shifts significant dollars from one side of these contractual relationships to another side for as long as a well produces

gas. Flywheel is likely to prevail in showing that the amendment to § 15-72-305 substantially impairs its contractual rights.

That conclusion raises the next question, "the means and end of the legislation." *Sveen*, 584 U.S. at 819. Again, one end is salutary: clarity in applicable law. But, the particular ends are less so. The Act does not clarify the law to benefit a wide swath of the public. Compare *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400 (1983), which involved all Kansas consumers of natural gas. While the payment of royalties in the Shale has been a vexed question, these disagreements do not present a crisis like how to handle defaulted mortgages during the Great Depression or respond to the economic effects of the COVID pandemic. *Blaisdell*, 290 U.S. at 416; *Heights Apartments, LLC v. Walz*, 30 F.4th 720, 723–24 (8th Cir. 2022). Instead, the understandable purpose of Act 1024 is to favor mineral owners, mostly Arkansawyers, over the few operators and working interest owners. These circumstances echo *Burgum*, where North Dakota changed the law to favor local farm equipment dealers over the equipment manufacturers. 932 F.3d at 729–30.

Turning from ends to means, Act 1024 shifts costs by disrupting a specific handful of contractual expectations. A witness testified that Flywheel, following the 2023 Arkansas Court of Appeals' decision, stopped deducting post-production costs for mineral owners with AOGC form leases. Act 1024 amends Ark. Code Ann. § 15-72-305

–13–

to confirm and extend that decision.  Flywheel—wearing its operator hat—must stop deducting post-production expenses from the statutory royalty for all mineral owners in integrated units.  Though the dollars are many, the affected Arkansawyers are not numerous.  The Act would redistribute part of the statutory royalty from the handful of operators to the few thousand mineral interest owners.  And there's no larger public need to do so.  *Compare Blaisdell*, 290 U.S. at 416; *Heights Apartments*, 30 F.4th at 723–24.  In both its ends and its means, Act 1024 is akin to the special interest legislation invalidated in *Burgum*, so it likely violates the Contract Clause.  932 F.3d at 732.

*

Because the plaintiffs are likely to succeed on their Contract Clause claims, the Court need not consider their Takings Clause and Due Process Clause claims.  *Brandt ex rel. Brandt v. Rutledge*, 47 F.4th 661, 669 (8th Cir. 2022).  The relief they seek is the same—an injunction against Act 1024's implementation and enforcement.  The Court therefore proceeds to the other *Dataphase* factors:  irreparable harm, the equitable balance, and the public interest.  *Dataphase*, 640 F.2d at 114.  The latter two merge when, as here, "the Government is the party opposing the preliminary injunction."  *Morehouse Enterprises, LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 78 F.4th 1011, 1018 (8th Cir. 2023).

"Economic loss, on its own, is not an irreparable injury so long as the losses can be recovered." *Wildhawk Investments, LLC v. Brava I.P., LLC*, 27 F.4th 587, 597 (8th Cir. 2022). Sometimes full recovery may be legally barred, for example, when sovereign immunity applies. Other times it may be practically barred, such as when a loss is either unquantifiable or intangible. *Ibid.* This case presents a mix of both.

Consider the practical challenges. Natural gas is a finite resource. And the wells in the Fayetteville Shale are in shallow decline. Year over year, it has become harder and less profitable to extract the natural gas as is. Removing deductions for post-production expenses from the equation will likely shorten the wells' projected economic lives, forcing Flywheel to shut in many wells prematurely. Plugged wells cannot be unplugged, except at great expense, and the gas gets left in the ground.

Everyone loses in that situation. Flywheel's profits get cut, and the mineral owners' royalties get cut off. If Flywheel prevails in its challenge to Act 1024, as the Court predicts it will, what would be its recourse? Could it sue the State for damages? No. *Kruger v. Nebraska*, 820 F.3d 295, 301 (8th Cir. 2016). Could it sue the mineral owners for the unextracted gas it had to abandon? Also no. The oil and gas leases end after drilling operations stop. *Plaintiffs' Exhibits 2–5*. The irreparable harm that Flywheel faces is not simply the possibility of overpaying royalties, which could be recovered if production continued; it's the loss of the finite, profit-generating resources that will

likely follow.  Because Flywheel "would be unable to fully recover such losses merely through [its] participation in the market," the Court finds that it is likely to suffer irreparable harm.  *Iowa Utilities Board v. F.C.C.*, 109 F.3d 418, 426 (8th Cir. 1996).

That leaves the final two *Dataphase* factors—the equitable balance and the public interest—which merge here.  *Morehouse Enterprises*, 78 F.4th at 1018.  Like Flywheel, the State also faces irreparable harm.  "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."  *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (quotations omitted).  This injury, though, is accounted for by *Rounds*'s heightened merits standard.  *Rodgers v. Bryant*, 942 F.3d 451, 459 (8th Cir. 2019).  The only question now is which way the equitable scales tip.

All material things considered, the Court finds that the equities favor Flywheel.  It is "always in the public interest to prevent the violation of a party's constitutional rights."  *Brandt*, 47 F.4th at 672 (quotations omitted).  And Act 1024 likely violates Flywheel's rights under the Contract Clause.  A temporary pause on Act 1024's *retroactive* application, limited to the plaintiffs, leaves much of this legislation undisturbed.  All parties agree that there are no Contract Clause

concerns with applying the Act prospectively.*** In the meantime, maintaining the status quo, coupled with adequate security, will do the least amount of harm to both sides.

*

The Court preliminarily enjoins Alan York (acting in his official capacity as the Director of the Arkansas Oil and Gas Commission) from enforcing Act 1024 against Flywheel Energy Production, LLC, Van Buren Energy Production, LLC, Razorback Production, LLC, and CAER Energy, LLC on any mineral lease signed before 5 August 2025. This preliminary injunction issues on the condition that Flywheel escrow, in an interest-bearing account, an amount equal to the deducted post-production expenses on the statutory royalty that it would have paid the mineral interest owners had the statute gone into effect. Fed. R. Civ. P. 65(c); *Stockslager v. Carroll Electric Coop. Corp.*, 528 F.2d 949, 951 (8th Cir. 1976). Flywheel must also file a detailed accounting about these escrowed funds, starting on 30 September 2025 and each quarter thereafter. The Court invites the parties' suggested refinements to the securities/escrow obligation. By 18 August 2025,

---

*** Although Flywheel's facial challenges under the Takings and Due Process Clauses have a prospective dimension, it conceded at the hearing that those claims are not its focus. In any event, the Court is not persuaded that Flywheel is likely to prevail on them. Facial challenges are notoriously "hard to win." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024).

the parties must meet, confer, and propose any changes they believe are needed.

The Court also encourages an appeal so this case can be consolidated and decided with the pending *Hurd*-progeny cases. If none of the related state court litigation, *e.g.*, the proposed-intervenors case, is decided by the Arkansas Supreme Court before the Eighth Circuit makes its decision, then at least the Court of Appeals can issue a comprehensive opinion about what Arkansas law requires against the day when the Arkansas Supreme Court provides a definitive construction of the statute.

So Ordered.

D.P. Marshall Jr.
United States District Judge

1 August 2025